# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| DIVERSIFIED INGREDIENTS, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> TRIPLE-T FOODS, INC., AMPRO ) <br> PRODUCTS, INC., and PROTEIN ) <br> PRODUCTS, INC., ) <br> ) <br> Defendants. ) | Case No. 4:09CV0956 AGF |✂

| | |
|---|---|
| AMPRO PRODUCTS, INC., ) <br> ) <br> Cross-claim Plaintiff, ) <br> ) <br> v. ) <br> ) <br> PROTEIN PRODUCTS, INC., ) <br> ) <br> Cross-claim Defendant. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court[1] on the motion of Defendant Triple-T Foods, Inc. ("Triple-T") to dismiss Plaintiff Diversified Ingredients, Inc.'s ("Diversified") second amended complaint for lack of personal jurisdiction and improper venue pursuant to

---

[1] The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

Federal Rule of Civil Procedure 12(b)(2) and 28 U.S.C. Section 1391(c); or in the alternative, to transfer venue to the United States District Court for the District of Kansas, pursuant to 28 U.S.C. 1404(a).  For the reasons set forth below the motion shall be denied in its entirety.  Also before the Court is Diversified's motion for sanctions against Triple-T for pursuing the above motion.  The motion for sanctions shall be denied.

## BACKGROUND

For the purposes of motions before the Court, the record establishes the following: Triple-T, a Kansas corporation, manufactures pet foot.  Diversified, a Missouri corporation, is a food ingredient merchandiser.  Since approximately 1997, Diversified essentially acted as a broker for Triple-T for ingredients that Triple-T wished to purchase for the manufacture of pet food.  Triple-T would send a purchase order to Diversified for a specific quantity of ingredients, at a certain price, for delivery during a certain period of time.  If Diversified agreed to fill the order, it would have a third party ship the ingredients to Triple-T in Kansas.

On January 5, 2009, Diversified entered into an agreement with Triple-T for the purchase by Triple-T of chicken meal.  Two shipments of chicken meal were delivered to Triple-T in Kansas, on or about January 7, 2009, by Ampro Products, Inc. ("Ampro"), pursuant to contracts Ampro had executed with Diversified.  Ampro, in turn, had purchased the chicken meal from Protein Products, Inc. ("PPI").  AMPRO and PPI are both Georgia corporations.

Triple-T accepted delivery of the chicken meal, paid Diversified, and used the chicken meal in its manufacture and supply of dog food to two customers, a Pennsylvania corporation and a Connecticut corporation. These customers subsequently claimed that some of the dog food from Triple-T was non-conforming and they filed an action for damages against Triple-T. Upon hearing the allegations of non-conformity, Triple-T stored the contaminated pet food at a storage facility in Joplin, Missouri, to separate it from Triple-T's conforming inventory.

Triple-T subsequently refused to pay for other ingredients received from Diversified pursuant to nine purchase orders unrelated to the chicken meal agreement. On May 1, 2009, Diversified initiated this action against Triple-T in Missouri state court, claiming breach of contract for the ingredients, unrelated to the chicken meal agreement, that were delivered to Triple-T between January and March 2009, but not paid for by Triple-T, in the amount of $575,025.99. Diversified also seeks declaratory relief with respect to the chicken meal agreement between Diversified and Triple-T.

On May 22, 2009, Triple-T filed a separate action against Diversified in Kansas state court, claiming breach of the chicken meal agreement, resulting in damages to Triple-T in the amount of $659,184.47. On June 19, 2009, Triple-T removed the Missouri state court action to this Court, and on June 22, 2009, Diversified removed the Kansas state court action to the United States District Court for the District of Kansas. On August 8, 2009, Diversified filed an amended complaint in the present action, adding

AMPRO and PPI as Defendants. The court presiding over the Kansas case stayed the litigation before it, pending resolution of the present lawsuit.

On October 15, 2009, Diversified filed its current second amended complaint. Count I claims breach of contract against Triple-T for failing to pay the $575,025.99 allegedly owed Diversified. Counts II, III, IV, and V are against Triple-T for the same monies under theories of "action on account," "account stated," unjust enrichment, and conversion, respectively. In Count VI, Diversified seeks declaratory judgment against Triple-T, AMPRO, and PSI with regard to the chicken meal contract. Diversified claims that if Triple-T was damaged as a result of non-conformity of the chicken meal that AMPRO shipped to Triple-T, then such damages were caused by AMPRO and/or PPI. Count VIII is against AMPRO for breach of contract resulting from shipping non-conforming chicken feed to Diversified, and Counts IX and X are against AMPRO and PPI for breach of implied warranties of merchantability and fitness with respect to the chicken meal in question.[2]

Diversified alleges in the second amended complaint that Triple-T transacts "systematic and continuous business in and through Missouri . . . and entered into the contracts at issue within St. Louis County." Diversified further alleges that the contracts and accounts in question "were made and serviced" in Missouri, and that all Defendants'

---

[2] Count VII of the second amended complaint, which was against all Defendants for breach of the duty of good faith, was voluntarily dismissed by Diversified. Count X was mistakenly labeled as Count XI.

"unlawful acts were directed at Diversified, a Missouri resident, and "Defendants should have realized that the brunt of the harm would be felt in Missouri such that it [sic] should have reasonably anticipated being haled into court here." Diversified states that the forum selection clause of at least one of the contracts at issue affords venue in Missouri.

On November 5, 2009, AMPRO filed a cross-claim against PPI related to the chicken meal. Triple-T now seeks to dismiss Diversified's second amended complaint for lack of personal jurisdiction or to have the action transferred to the district court in Kansas.

## ARGUMENTS OF THE PARTIES

Triple-T argues that Diversified's jurisdictional allegations in the second amended complaint are vague and conclusory, noting that Diversified does not allege actual physical presence of Triple-T in Missouri. Triple-T posits that its agreements with Diversified, including the chicken feed agreement, were made in Kansas because they were consummated when Triple-T accepted price quotes from Diversified. In any event, Defendant argues, merely entering into a contract with a forum resident does not provide the requisite contact between Triple-T and Missouri to subject Triple-T to personal jurisdiction in this Court without violating the Due Process Clause and Missouri's long-arm statute.

In support of its position, Triple-T has submitted the affidavit of its President, Kurt Terlip, who attested that Triple-T does not have a place of business, agent, mailbox, telephone number, or real estate in Missouri, is not registered to conduct business in

5

Missouri, and does not directly advertise or solicit business in Missouri. Terlip states that Triple-T does not ship its pet food from its Kansas plant, but rather all its customers pick up the product FOB (freight-on-board) from the plant.

The affidavit further states that the agreement to purchase the chicken meal from Diversified was entered into in Kansas, inasmuch as Triple-T ordered the chicken meal from Diversified through Triple-T's purchase agent by telephone from its Kansas business location, and sent its purchase order by mail to Diversified. Terlip attests that the contaminated pet food would not have been stored at the Joplin, Missouri facility had it not been contaminated.

Triple-T also argues that venue is improper in this Court, requiring dismissal of the case or transfer to the proper venue, which Triple-T asserts is the District of Kansas, where Triple-T resides and where Triple-T has its own action currently pending against Diversified. Triple-T argues that Kansas is a more convenient venue, as those individuals necessary to provide evidence on Triple-T's behalf reside in Kansas.

In response, Diversified argues that this Court may exercise personal jurisdiction over Triple-T because Triple-T made numerous contracts in Missouri, paid millions of dollars to Missouri businesses, shipped goods into Missouri, and sought the protection of Missouri courts as a plaintiff in a lawsuit. Diversified submits a copy of a complaint filed by "Triple T Foods, Inc., d/b/a/ Natural Life Pet Products," in Missouri state court on May 2, 2000, in which the plaintiff alleged that it was a Kansas corporation "authorized to do business in Missouri." The suit was for money due the plaintiff for products sold to

the Missouri defendant, pursuant to invoices showing the plaintiff at Triple-T's Kansas address. (Doc. # 67-16 at 11-19.)

Diversified also submits copies of invoices from Triple-T to other Missouri businesses, showing a total dollar amount sent by Triple-T into Missouri since 2004 for ingredients, pursuant to purchase orders accepted in Missouri, of approximately $37 million dollars. Triple-T also manufactured/co-packaged pet food for two Missouri companies from 2000 to 2008, with gross revenues to Triple-T from one of these companies of approximately $10 million annually from 2005 through 2008. The evidence shows that Triple-T initiated communications via telephone, fax, e-mail, or mail with all of these Missouri residents, including Diversified. (Exs. to Doc. # 67.)

Diversified documents the business Triple-T did with it from February 1997 until March 2009, pursuant to approximately 241 contracts. (Doc. #67-5.) Until the non-payment at issue, Triple-T always sent payment to Diversified at Diversified's place of business in Missouri. In a deposition taken on October 23, 2009, Terlip testified that over the past ten years, Triple-T shipped samples of its products to Missouri residents "all the time," which he modified to be about once a month, and that he went to Missouri on behalf of Triple-T to visit the two companies for which Triple-T manufactured pet food, one time each. (Doc. #73 at 118-21.) [3]

---

[3] Diversified also relies upon the following statement made by Triple-T in briefing the motion to stay the Kansas lawsuit:

Diversified points out its Missouri lawsuit contains counts seeking to recover

7

In reply, Triple-T reasserts its argument that the contracts at issue are Kansas contracts. In reply to Diversified's argument based on the May 2000 lawsuit filed by Triple T Foods, Inc., d/b/a/ Natural life Pet Products, Triple-T states that the lawsuit "appears to list the wrong company" as the plaintiff, and should have listed an Arkansas entity, owned by Terlip's brother, but that Triple-T was unable to "access the information" to substantiate this. Triple-T argues that, in any event, the filing of one lawsuit does not establish sufficient contacts with Missouri for jurisdictional purposes. (Doc. #73 at 15.)

## DISCUSSION

**Personal Jurisdiction**

Federal Rule of Civil Procedure 12(b)(2) allows for dismissal of a claim if the Court does not have personal jurisdiction over the defendants. To defeat a motion to dismiss for lack of personal jurisdiction, the nonmoving party need only make a prima facie showing of jurisdiction. Epps v. Stewart Info. Servs. Corp, 327 F.2d 642, 647 (8th

---

> more than $600,000.00 it alleges Triple T has failed to pay under contracts unrelated to the chicken meal contract. That is true, but that is Diversified's claim against Triple T, and it will continue to have the benefit of having chosen its forum on its claim.

(Doc. #67-17.)

The Court believes that this argument is disingenuous, because as Triple-T notes in its reply, Diversified failed to inform the Court that in further briefing, on the motion to stay, Triple-T clarified its position that Kansas was the appropriate forum for all the disputes between the parties. (Doc. #73 at 16.)

Cir. 2003). The Court must view the evidence in the light most favorable to the nonmoving party and resolve factual conflicts in its favor. As the party seeking to establish the court's personal jurisdiction, however, the nonmoving party "carries the burden of proof, and the burden does not shift to the party challenging jurisdiction." Id.

In a diversity action, a federal court may assume jurisdiction over a nonresident defendant only to the extent permitted by the long-arm statute of the forum state and by the Due Process Clause. Ferrell v. West Bend Mut. Ins. Co., 393 F.3d 786, 790 (8th Cir. 2005). Because the Missouri long-arm statute, Mo. Rev. Stat. § 506.500.1, authorizes the exercise of jurisdiction over nonresidents to the extent permissible under the Due Process Clause, the question is whether the assertion of personal jurisdiction would violate due process. Porter v. Berall, 293 F.3d 1073, 1075 (8th Cir. 2002); Dominium Austin Partners, L.L.C. v. Emerson, 248 F.3d 720, 726 (8th Cir. 2001).

For the assertion of personal jurisdiction over a nonresident defendant, due process requires "minimum contacts" between the nonresident defendant and the forum state such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-92 (1980) (citations omitted). Sufficient contacts exist when "the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." Id. at 297.

"In assessing the defendant's reasonable anticipation, it is essential in each case that there be some act by which the defendant purposely avails itself of the privilege of

conducting activities within the forum State, thus invoking the benefits and protections of its laws." Stanton v. St. Jude Med., Inc., 340 F.3d 690, 693-94 (8th Cir. 2003) (citation omitted.) "The 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts or of the 'unilateral activity of another party or a third person.'" Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)).

As explained in Burger King,

> Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State. Thus where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

Burger King, 471 U.S. at 475-76. "Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State. . . . [I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines . . . . " Id. at 476.

There are two types of personal jurisdiction -- general and specific. General jurisdiction arises when a defendant's contacts with the forum state are so "continuous and systematic" that the defendant may be subject to suit there for causes of action distinct from the in-state activities; specific jurisdiction arises when the defendant has purposely directed its activities at the forum state, and the cause of action relates to those

10

activities. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 & n.8 (1984).

The Eighth Circuit applies a five factor test in analyzing the constitutional requirements needed for personal jurisdiction, as follows:

> (1) the nature and quality of the contacts with the forum state; (2) the quantity of contacts with the forum; (3) the relation of the cause of action to these contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. The first three factors are of primary importance, and the last two are secondary factors.

Stanton, 340 F.3d at 694.

Here, the agreements at issue were Missouri contracts. See U.S. Durum Milling, Inc. v. Frescala Foods, Inc., 785 F. Supp. 1369, 1371-73 (E.D. Mo. 1992) (holding that under Missouri law, the final act which gave rise to binding agreements for sale of grain occurred in Missouri when the Missouri seller accepted in Missouri the nonforum buyer's bid for stated quantity of grain at fixed price for delivery during definite period of time); see also Tiger Mfg. Corp. v. Loadstar Material Handling Equip., Ltd., 341 F. Supp. 2d 1107, 1110 (W.D. Mo. 2004); Angelica Corp. v. Gallery Mfg. Corp., 904 F. Supp. 993, 996 n.1 (E.D. Mo. 1995).

It is true that the mere making of a contract with a resident is not enough to confer jurisdiction, and that the mere use of interstate facilities, such as telephones, mail or facsimile machines, is also not enough to confer jurisdiction. See, e.g., Johnson v. Woodcock, 444 F.3d 953, 956 (8th Cir. 2006); Porter, 293 F.3d at 1076; Bell Paper Box, Inc. v. Trans W. Polymers, Inc., 53 F.3d 920, 923 (8th Cir. 1995). The Court concludes,

11

however, that here there are enough additional factors to support the exercise of personal jurisdiction over Triple-T. It is undisputed that Triple-T had an ongoing and extensive business relationship with Diversified since 1997 that involved Triple-T initiating contact with Diversified for the purchase of ingredients, and sending numerous purchase orders to Diversified in Missouri for the purchase of the ingredients. This lawsuit arises out of ten such purchase orders. Furthermore, the pet food manufactured by Triple-T using the chicken feed at issue in Diversified's declaratory judgment count was stored by Triple-T in Missouri.

Although the matter is not free from doubt, the Court concludes that Triple-T purposefully availed itself of the privilege of conducting business within Missouri, and could reasonably anticipate being haled into court in Missouri for litigation involving its contracts with Diversified. See U.S. Durum Milling, Inc., 785 F. Supp. at 1371-73 (holding that the federal district court in Missouri had personal jurisdiction over a non-resident buyer based upon the acceptance of two purchase orders from the buyer by a Missouri corporation); cf. Bell Paper Box, Inc., 53 F.3d at 922 (finding that a single purchase order linking the non-resident defendant buyer to the forum was not enough to support personal jurisdiction).

Triple-T asserts that U.S. Durum is distinguishable from this case because in U.S. Durum, the plaintiff seller bid on items the defendant buyers were offering, and the sellers could accept or reject the bid, whereas here, Diversified offered Triple-T a price for chicken meal and Triple-T could either accept Diversified's price or look for a better

option elsewhere, with the final act giving rise to the binding agreement being Triple-T's acceptance of Diversified's price. But this argument contradicts Triple-T's own evidence that its purchase orders contained specific terms and that upon acceptance by Diversified, an agreement was formed. The argument is also in contravention of the above conclusion that the contracts at issue were Missouri contracts.

Triple-T cites to Scullin Steel Co. v. National Railway Utilization Corp., 676 F.2d 309, 313 (8th Cir. 1982), in support of its argument that its contacts with Missouri were insufficient to support this Court's personal jurisdiction over it. In Scullin Steel, the contract at issue was negotiated in Pennsylvania, not Missouri, the forum state. Furthermore, the non-Missouri defendant was not authorized to do business in Missouri. Here, as noted above, the contracts at issue were made in Missouri, where the purchase orders were accepted, and the Court concludes that Triple-T cannot assert that it is not authorized to do business in Missouri, in light of the above-referenced statement to the contrary in its lawsuit filed in May 2000. In addition, Scullin Steel was decided before the Supreme Court's Burger King decision.

Triple-T also cites CPC-Rexcell, Inc. v. La Corona Foods, Inc., 726 F. Supp. 754 (E.D. Mo. 1989), in support of its position. But in that case, as in Scullin Steel, the court specifically noted that the non-resident buyer was not authorized to conduct business in Missouri, and also that none of its residents ever "stepped foot in Missouri." Furthermore, "[a]ll negotiations [for the contractual arrangement sued upon] occurred in Arizona and California . . . and when the parties entered into the arrangement in question,

13

plaintiff's 'headquarters' was not located in [Missouri.]" CPC-Rexcell, Inc., 726 F. Supp. at 757.

In addition to Triple-T's business activities involving Diversified, Triple-T conducted extensive business with other Missouri entities, in connection with which Triple-T sent millions of dollars into Missouri, traveled to Missouri at least twice, shipped samples regularly into Missouri, and availed itself of the Missouri courts to enforce its contractual rights. In sum, the Court concludes that the nature and quality of Triple-T's contacts with Missouri are substantial enough such that asserting personal jurisdiction over Triple-T in this case comports with the dictates of due process. The other relevant factors do not disaffirm this conclusion.

**Venue**

Triple-T's argument that venue is not proper in this Court under 28 U.S.C. § 1391(a) because Triple-T is not subject to personal jurisdiction in Missouri is without merit in light of the Court's above ruling. Triple-T also seeks transfer under 28 U.S.C. § 1404(a), which provides as follows: "For the convenience of parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

The statute "was drafted in accordance with the doctrine of forum non conveniens, permitting transfer to a more convenient forum, even though the venue is proper." In re Apple, Inc., No. 09-3689, 2010 WL 1526453, at *2, ___ F.3d ___ (8th Cir. April 19, 2010) (quoting Van Dusen v. Barrack, 376 U.S. 612, 634 n.30 (1964)). "Congress, in

passing § 1404(a), was primarily concerned with the problems arising where, despite the propriety of the plaintiff's venue selection, the chosen forum was an inconvenient one." Id.

In determining whether to transfer venue under § 1404(a), courts engage in a "case-by-case evaluation of the particular circumstances at hand and a consideration of all relevant factors." Terra Int'l, Inc. v. Miss. Chem. Corp., 119 F.3d 688, 691 (8th Cir. 1997). Factors which courts consider under the "convenience" prong include (1) the convenience of the parties, (2) the convenience of the witnesses -- including the willingness of witnesses to appear, the ability to subpoena witnesses, and the adequacy of deposition testimony, (3) accessibility of records and documents, (4) the location where the conduct complained of occurred, and (5) the applicability of each state's forum law. The most important of these interests is the convenience of the witnesses. Id.

Factors considered under the "interest of justice" prong include (1) judicial economy, (2) the plaintiff's choice of forum, (3) the comparative costs to the parties of litigating in each forum, (4) each party's ability to enforce a judgment, (5) obstacles to a fair trial, (6) conflict of law issues, and (7) the advantages of having a local court determine questions of local law. Id. Federal courts generally give "considerable deference to a plaintiff's choice of forum and thus the party seeking a transfer under § 1404(a) typically bears the burden of proving that a transfer is warranted." Id. at 695.

Upon review of the record, the Court concludes that Triple-T has not met its burden of establishing that the case should be transferred to Kansas. Diversified's choice

of forum weighs against transfer. The record establishes that Triple-T's business address is within ten miles of Missouri. Transfer on the basis that a Kansas forum would be more convenient for Triple-T's witnesses, without more, would merely shift the inconvenience from one party to the other, which is not a valid basis for transfer. See Van Dusen, 376 U.S. at 645-46 ("Section 1404(a) provides for transfer to a more convenient forum, not to a forum likely to prove equally convenient or inconvenient.").

**Sanctions**

Diversified asserts that it should be awarded its fees and costs incurred in defending Triple-T's motion to dismiss because the motion was in "bad faith," and throughout litigation of the motion, Triple-T "has repeatedly attempted to obstruct, hide, and deny facts relevant to a jurisdictional analysis." Upon review of the record, the Court concludes that this is not a case in which sanctions are appropriate.

**CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion to dismiss Plaintiff's Second Amended Complaint for lack of personal jurisdiction and improper venue, or in the alternative, to transfer venue, is **DENIED**. [Doc. #54]

**IT IS FURTHER ORDERED** that Plaintiff's motion for sanctions is **DENIED**.

[Doc. #67]

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of May, 2010.